EAST CENTRAL ARKANSAS REGIONAL HOUSING AUTHORITY
v. MOORE.

4-9573                                              246 S. W. 2d 115

Opinion delivered October 29, 1951.

*John D. Thweatt* and *Cooper Thweatt,* for appellant.

*J. B. Reed,* for appellee.

PAUL WARD, J. This suit poses the task of interpreting the contractual relations between appellant and a large number of property owners, and applying thereto voluminous testimony which itself contains all the intricacies and details of bookkeeping. The problem is to try and determine what would be the right price for appellant to charge each property owner should he decide to exercise his right to purchase. For a proper understanding of the issue it is necessary to give a brief preliminary history. In explaining the contractual relations we will not copy in full the instruments upon which they rest because they are lengthy and involved, but will give our own interpretation of the same.

The East Central Arkansas Regional Housing Authority, hereafter referred to as the Authority, was created pursuant to Act 298 of 1937 of Arkansas, as amended by Act 352 of 1941. It was organized October 28, 1941, to include fourteen counties, one of which was Lonoke County, where the property involved is located. The purpose of the Authority was to provide safe and

sanitary dwellings to persons of low income at rents they could afford to pay. The method of procedure was for the landowner to convey to the Authority by warranty deed one acre of land upon which the Authority was to build a house and make other improvements, but the deed contained a reservation or option giving the landowner a right to repurchase. The land not deeded to the Authority was designated "Parcel A" and the one acre was designated "Parcel B." The option to repurchase did not specify the price to be charged by the Authority, but it designated three elements to be considered, *viz*: (a) the price should be the *fair value* of Parcel B including the improvements constructed thereon [by the Authority], but (b) it was not to be more than the capital cost of acquiring and developing Parcel B, and (c) it was not to be less than the unpaid balance due on each Parcel B, *i. e.*, the proportionate balance. Certain obligations were imposed on the landowner, such as to use Parcel A for agriculture purposes and to insure that the occupant of Parcel B worked on the farm, but these matters are not material here.

Appellant introduced what appears to be a complete set of books, explaining them by testimony, and thereby showed, we think, that the average cost of developing each Parcel B was either $2,316.17 or $2,744.43 depending on whether we hold the accounting period should end June 1, 1942, when the last house was constructed or September 30, 1946, when plans for further acquisition and development were abandoned. So far as the figures themselves are concerned appellees do not question the correctness of the above cost totals.

In determining the issue we think it is right to choose the smaller figure of $2,316.17 as the average cost per Parcel B which was fixed by appellant as of June 1, 1942, when the last house was built. If we accept the larger figure, calculated as of September 30, 1946, we must add to the total cost the sum of $66,456.91. This would not seem equitable in view of the statement in appellant's brief that, "Since June 1, 1942, the Authority has spent $66,456.91 for cost of acquisition and development—he

has no breakdown for other costs after this date. No property, real or personal, has been acquired by the Authority since the completion of the last unit, June 1, 1942. No house has been built or new units developed since then.'' In selecting the smaller sum certainly it is not intended to impute any bad faith to appellant, but it must be realized that it and not appellees were in complete control of operations and it is difficult to justify the placing upon appellees an additional burden of more than $66,000 with nothing to show for it. No doubt the war situation entered into the picture, but June, 1942, was late enough to afford a forecast of things to come.

According to appellant's statement the unamortized [average] amount due on each Parcel B was $2,257.12 as of June 1, 1942. As was heretofore explained this *fair value* that appellees were to pay could not therefore be less than $2,257.12.

The chancellor held that the *fair* value of each Parcel B was $2,000 and fixed that as the amount at which the landowners could repurchase, but he assigned no reason for disregarding the minimum figure of $2,257.12 mentioned above and we know of no such reason. There is no point in discussing the *fair value* here except to show it exceeds the last mentioned figure, and this we are unable to do under the testimony. The testimony on the question was in sharp conflict. Appellant's testimony tended to show the houses were worth at this time over $3,000. On the other hand appellees offered testimony to show that a house like this could be built now [considering higher costs] for around $2,300 and that the houses would depreciate 10% each year. It was also shown that some of the houses are now in poor condition. The most we can say is that the fair value does not exceed $2,257.12. Here it should be stated that all 75 houses were built exactly alike and that while there may now be a difference in value, both parties treat the average house as a basis of determining the cost, the unamortized balance, and the fair value, and so do we.

There is no way for this court to fix the repurchase price at less than $2,257.12 without finding that this fig-

ure is greater than the balance due or, perhaps to the same effect, by finding that the construction costs are excessive. We have examined the mass of figures which show the many different items of cost of construction, but are unable to say which, if any, are excessive, and no light on this point has been furnished us. Appellees were unable to point out any specific instance of bad faith or bad judgment.

The decree of the lower court is reversed and the chancellor is directed to enter an order consistent with this opinion.

The Chief Justice thinks the Authority's failure to build the number of houses contemplated when this court affirmed validity of Act 298 of 1937 was a breach of an implied contract. See *Kerr* v. *East Central Arkansas Regional Housing Authority,* 208 Ark. 625, 187 S. W. 2d 189. Because of the breach only the actual cost of production based on the maximum construction program or inducement should be charged the home-owner. This appears to have been less than $2,000.